Case number 20-6006 Estate of Beunos Lee Erwin v. Greene County TN et al. Oral argument not to exceed 15 minutes per side. Mr. Baker for the appellant. Good morning, your honors. My name is Lance Baker and I represent the estate this morning of Beunos Erwin. We're here appealing the district court's opinion in this matter. At the outset, I would like to address that this case, in our opinion, is a straightforward, common sense, very relevant opinion given the policing and the backdrop that we're seeing on a daily basis at this point. But certainly, not to mention that it's relevant, but also a recurring situation that police officers are going to face time and time again, and in fact, are probably facing somewhere in this country at this very moment. We have to have guidance on an issue like this, okay? It's got to be much more clear than just being able to tase an 81-year-old elderly woman with advanced dementia. At the end of the day, we believe that the district court erred primarily in taking this out of the province of the jury. This should be a jury question and not something that was decided so quickly by the court. What I would like to first turn to and talk about is, of course, the Graham factors. And as we know, in order to state a claim for excessive force under the Fourth Amendment, the facts asserted must show that both the seizure occurred and that a seizure was unreasonable. In making this determination, the court must look at the following factors in determining the totality of the circumstances. And I would submit that the district court judge erred in this case by not considering the totality of the circumstances in this matter. Of course, and as this court is well aware, there are three factors that are important when evaluating a case such as this. Number one, the severity of the crime at issue in this case. The district court opined that this first factor was just not relevant. They didn't want to discuss it. The problem with that is, is that there was no crime. There was no crime at all that Ms. Irwin committed whatsoever. She wasn't charged with the crime before. She wasn't charged with a crime after. Even several months after, she was never charged with a crime. Lieutenant Jones never told her at any point in time throughout this evening that she was under arrest. So we believe that factor should certainly err on the side of the appellant in this situation and certainly should have been addressed more so by the district court in considering the totality of the circumstances. Secondly, and what the court seemed to hinge its opinion on, was the second grand factor and that was whether the suspect poses an immediate threat of safety to the officers or others. In this situation, Ms. Irwin was 81 years old. The officers that came to her house twice that night were very well familiar with Ms. Irwin and her son. I can't tell you how many times they've been called before. The entire Greene County Sheriff's was aware of Ms. Irwin, her diminished capacity, her advanced dementia. Not only that, they knew that she was never a danger. Any times that they have been out there to her house in prior occasions or been called by her son, she's never once had a weapon, never once been arrested. There's never even once, to my knowledge at this point in time, ever been a threat of any violence. The main issue that we're talking about today is whether or not a garden rake, and I'm sure you'll hear by opposing counsel that it has the metal tins on it, which make it a much more riskier rake. But at the end of the day, we are talking about an 81-year-old elderly woman that was walking towards Lieutenant Jones with a rake in hand. He was out there originally around midnight for the call. Ms. Irwin had calmed down. She discussed things with the officer. The officer clearly knew that there's something wrong with her. He's asking her, do you know who the president is? Do you know your date of birth? So there is complete advance notice on the part of Lieutenant Jones that she is not in her right frame of mind. In support of this, the EMTs were vital signs, things of that nature. There was no mobile crisis or mental health counselor called. Upon leaving the scene the first time, shortly after midnight, Lieutenant Jones, in this case, drove approximately a mile, mile and a half up the street, sat in what appears to be just an empty parking lot because he knows, and I believe even states on his dash cam, body cam, that he is going to have to go back out there. In fact, he is right. About an hour after he parks in the parking lot, another call ensues from dispatch that the same thing is occurring. What was the complaint to the officers at that point that your client was doing? Your Honor, ultimately, that she was combative. That she threatened to kill him? She did not ever at any point in time threaten to kill the officers. I think the original call from her son, the first one around midnight, he does state on the dispatch call 9-1-1 that she's threatening to kill me, she's threatening to hurt me, things of that nature. But certainly at this point in time and several occasions prior, this department and even this specific officer at this point in time cannot reasonably expect Ms. Irwin to be of any sort of danger. Why is that? Well, she's never presented any danger in the past and certainly when he was out there just discussing with her around the first call around midnight. Well, she's not a sound mind and she threatens to kill her son. I mean, are the officers supposed to totally discount that? I mean, somebody of not sound mind and says, I'm going to kill you. I think it's got to be taken somewhat seriously, doesn't it? I think it certainly should, Judge. And I respect the Graham decision. Of course, we have the language that this court, of course, is very familiar with. The circumstances that are tense, uncertain, and rapidly evolving. The problem, and I'm not trying to Monday morning quarterback or hindsight 2020 Officer Jones at all in this case. All I'm saying is that there were other alternatives when he got to the scene. Okay. Let's talk about the incident because I have seen the video and she does have this metal rake in her hand and the officer tells her to stop. And she says, no, I'm not going to stop. I'm not going to stop. And she continues to advance toward the officer with the rake in her hand. I mean, that's those are the facts. Are they not? I would say that she is walking towards Officer Jones at this point. And again, it goes back to whether or not there should be a jury question of how she was walking, how she was holding brave. Is it really a dispute about that? I mean, the officer's testimony is what it is. I don't I didn't see any rebuttal testimony rebutting what the officer's testimony as to her advancement. Is there contrary testimony in the record? There is no contrary evidence from my client because he came out shortly thereafter. But I will say this to the court. Officer Jones contradicts his statement in that in his testimony, he uses the term she was coming at me in an offensive position. However, she never lunged at me. She never appeared to try to strike me. That was his testimony. So that's why there is what's in the dispute of fact. I mean, those are characterizations, I suppose. But I don't see any factual dispute here. Well, Your Honor, I would respectfully disagree in that she wasn't advancing at him, did never lunge. I mean, Officer Jones is admitted. She's not advancing to him. I mean, I think video I think the video shows that she is. I think that she's walking towards him again. I think that it should be in the province of a jury to determine what Officer Jones should have done. I believe should have done on undisputed facts. You think that the the Fourth Amendment violation on undisputed facts should be different depending on different juries? No, that's not what I'm saying, Judge. I think that there were alternatives that Lieutenant Jones could have used and put in place before using what I would amount to as deadly force given taser is deadly force. I don't think so. I believe it is deadly force, Judge. But I would make it different with you than that. And that's and that's perfectly fine. Judge, what I would say in this case, and putting whether or not it was lethal force or nonlethal force aside, I think when it comes down to it, we have to look at whether or not Miss Irwin was actively resisting or passively resisting. There is a case from 2013 that the Sixth Circuit decided, and it stated that it is clearly established that the use of force on a nonresistant or passively resistant individual, like I would submit Miss Irwin was in this matter, may constitute excessive force. Furthermore, and this is from this court in 2020, Graves v. Malone clearly established the proposition of law that it is objectively unreasonable to tase a nonresisting suspect. Again, we're not talking about someone who is a danger. He could have very easily grabbed the rake from Miss Irwin at this point. He could have backed away. Lieutenant Jones is someone who's 5'7". We are going to require police officers to engage in hand-to-hand combat before they can defend themselves. That's a proposition of law that you want us to establish in this case, that you have to do hand-to-hand combat before you can use a taser? No, Judge, but I think in this case, what distinguishes... Because he's bigger and she's smaller, that's your alternative, and you would have us rule as a matter of law. He's got to do that. Well, there is precedent in this court that the court certainly consider Miss Irwin's petite stature, her weight, her mental capacity. That's something that certainly the court and the jury can consider. Talking about dangerous precedent, I think this court, by signaling to the public, I'm sure this court, as I do, have had someone in their family who has had Alzheimer's or some type of dementia, and Mr. Irwin on this particular night just repeatedly just needed some help. He needed some intervention from police, from someone in the medical field, and that just was not done. So I think it's more of a danger that this court sends some sort of chilling signal to the public that, hey, if we call someone to help us like the police and law enforcement are supposed to do, if our loved one can't remember, is disoriented, is having delusions, that they may show up and get tased because an 81-year-old or an elderly individual has a rake in their hand. Mr. Baker, let me ask you, let's just change the scenario. As I recall the testimony, I looked at the dash cams as well, and I recall Officer or Lieutenant Jones saying the 50 feet that was between the two of them was, I think he used the word evaporating quickly, and by the time he decided to use the taser, she was within 10 to 12 feet of him. What if she did not have this rake, which is not your sort of standard garden rake that you use from the pictures I've seen to rake your leaves. It's got the harder tines or the really hard metal rake portion, but what if it had been a knife? Would you have the same argument here? Would you expect Lieutenant Jones to rest the knife from Ms. Irwin's hands at that point? Would there be some duty for him to do that in that sort of scenario? I think at that point, and again, we go back to the totality of the circumstances and what is reasonable, and that goes to whether or not Ms. Irwin was an imminent threat of either death and or bodily injury. Okay, so she's got a knife raised. Yes. She's 10 feet away from him and advancing in his direction, and he's got to make a decision in the moment as to what action to take. And so the question is, I guess, does she pose an imminent threat to him at that moment? And what under Graham and our jurisprudence on qualified immunity, what would be objectively reasonable for him to do? I think a taser in that incident that we're discussing, hypothetically, I think that it would have been reasonable at that point for Officer Jones to use the taser, to deploy the knife. I do believe that. But in this particular instance, if we're talking about a knife, something that, depending on what type or what size of knife it is, I'm just assuming you're talking about maybe your basic kitchen knife. A kitchen knife, yeah. That is a much smaller device than something that is six feet long that a trained officer on a daily basis, actually not necessarily a trained officer because he did testify, ultimately, that he's not even trained in hand-to-hand combat unless it's his last option, unless it's an emergency situation, which I never really understood as part of his testimony. But I do think in that position that you just described, Your Honor, that it would be reasonable if Officer Jones, Lieutenant Jones, used the taser in that specific scenario, not when an 81-year-old woman is walking towards you with a rake. Okay. As a matter of law, it would be reasonable, counsel? Yes. As opposed to you, you would submit that question to the jury or not with a knife? No, I think this court, I think that the weapon that was used certainly changes the whole scenario at this point. But I think that the jury should be able to consider whether an 81-year-old woman with advanced dementia was really an imminent threat to three officers, especially one that's But if she had a knife, it doesn't go to the jury, only if she has a rake. Is that your position? I think she wasn't going to shoot the rake. She wasn't going to stab the rake. There was no testimony. I think that's what the inference is, that she's going to use these hard metal ends of the rake to actually assault him. I think that's the theory anyway. Assault just kind of the same way you would assault with a knife, but probably not as effectively, that's all. Judge, I think if we're talking about inferences, I think that all inferences should be drawn against the non-moving party. That's the standard and that should be submitted. Well, I'm not sure it's true in qualified immunity. I think once qualified immunity is raised, it's the plaintiff's burden to rebut the assertion of qualified immunity. Isn't that what the law is? That is. That is the law. I think the inference actually, I think it shifts, but okay. I have no more questions, Chief. Thank you. Apparently, there are no other questions at this point. We'll hear next from Mr. Lauderback. May it please the court. My name is Benjamin Lauderback and I have the privilege and pleasure of representing the appellees in this matter, Lieutenant Michael Jones and Greene County, Tennessee. Before I delve into the facts and the questions from the court, there was a comment made initially by counsel for the plaintiff, the appellant, and I wrote it down and in quotes, he is asking this court, it has to be much more clear. He's asking this court to make the law much more clear. I don't really want to start off with the qualified immunity argument because I don't think among the two prongs of qualified immunity either reached that there was no constitutional violation, but he has all but admitted in that first minute of his argument that it is not clear, that this law is not clear. He's asking this court to do that through this case. If that's the situation, if that's the inescapable that Lieutenant Jones is entitled to qualified immunity. The gram factors do play a role and there are factors. The totality of the circumstances, the law referenced by counsel is on point, it's exact. When I get to my office from law enforcement, I listen to what they tell me, of course, and I have the gram factors in mind. It's interesting because these officers, deputies, it doesn't matter which force, they're familiar with the gram factors. They know the gram factors because they've had it beaten into their heads, both through their academy training and over their annual in-service training over the years. What they don't seem to understand or what these circumstances are that could play a role in altering these factors one way or the other in a case. I sit and I listen to them and I get the Do you have any facts, Mr. or Ms. Plaintiff, that would alter these factors that are different than the facts I've received? In this case, Judge Griffin is exactly right. There are no disputed facts. Every fact in this case is one of the rare ones I can sit here and say there are legitimately no disputed facts. The son comes out of the house and his testimony is he saw one Taser was fired and in that one second, he saw his mother, in his own words, brandishing the rake with it over his head. He saw his mother still advancing towards the officer and at the time the Taser was fired, the probes versus a drive stun, she was still advancing towards the officer who had at this point retreated back into the roadway. Judge Griffin's right. There's no law telling law enforcement under these circumstances that they have to retreat. Nonetheless, Lieutenant Jones was retreating when he launched the Taser. This rake is five feet long. This is Irwin. Let's assume her arms are two feet long. Let's assume her stride is two feet long. We're now at nine feet. That's one step away from being able to bring this rake down in a forest that, frankly, I've got a bow rake here and I used it in the yard this morning, I'm sorry, this weekend. I use it to get rocks out of my garden. I use it to hack the earth. I'm sitting in a leather chair. If I drop this rake on this leather chair, my partners are going to be upset with me and I'm having to buy the chair. I drop it on the sheetrock back behind me, my landlord's going to be upset with me because I'm going to have to replace a hole in the wall to pay for it. It's designed to tear up the earth. It's designed to tear up rocks out of the earth. Law enforcement should not be required to wait within one foot before having to decide if this person is frail enough to perhaps only knock out some teeth, perhaps only eliminate my vision out of one eye, perhaps cause nerve rake from an 81-year-old woman, but I am going to potentially suffer from serious and significant bodily injury. These law enforcement officials shouldn't have to make that decision and what we all will agree in this case was a very tense and very rapidly evolving situation. Less than 30 seconds from the time he pulled up from his vehicle, got out again walking slowly. There's no evidence he ran toward her. There's no evidence he was aggressive. There's no evidence he ever raised his voice once with her. He made his command clear and loud and we know she understood it. Why do we know she understood it? Because she responded in an articulate manner that reveals her understanding. No matter if she had dementia, no matter if she was intoxicated, no matter if she was on any kind of legal or illegal substances. These factors shouldn't have to be considered by the officer who's having make this split-second decision. I'm glad to answer any questions the court may have, but if we go through the the grand factors, the severity of the crime at this point, and counsel is right, Ms. Irwin, an 80-year-old woman, she suffered from other ailments. She ultimately passed away from injuries related to this accident that's been stipulated to or this incident rather. There's no reason to file charges against her. There was a it's in the record there was a consultation made between the sheriff and this lieutenant. There's no reason to, for lack of a better phrase, I don't mean any offense, but to beat a dead horse and charge this woman with this. There's no reason to do that, nor is there any requirement to do that. The false imprisonment claim in this situation hasn't been referenced yet, but there was clearly probable and just cause to seize this woman who had, looking back to the grand factors and the severity of the crime, committed an aggravated assault prior to the force being used. She was clearly an immediate threat to the safety of the officer, undisputed. The third factor is she actively resisting arrest. When she says, I'm not going to stop, I'm not going to stop, that is not passive resistance. That is active resistance. The case law is quite clear and we've cited it in the record. Active resistance warrants a tase, use a taser. That's clear law. Clear as the facts are in this case, that is clear law. Let me jump over to the state enough that I don't think we get to the clearly established prong. Of course, the court can do what it wants and the court can take you to the prong as it seems deems fit. There clearly was not a section 1983 violation of Ms. Irwin's constitutional rights in the situation, but if the court determines that there was, Judge Corker, the district judge, did an excellent job of setting out the law on qualified immunity. He did an excellent job of noting that there is no case with similar facts to this one that would put Lieutenant Jones on notice in 2017 that his actions of using a taser to subdue a suspect who's approaching him brandishing a weapon with metal tines, that the use of the taser was unlawful. So I would urge this court, if it were to find that perhaps a metal rake doesn't meet the threshold of a knife, kitchen knife, rusty knife, pocket knife, what have you, then certainly there's an entitlement to immunity for Lieutenant Jones under the qualified immunity doctrine. And as such, there wouldn't be any deliberate indifference as it relates to the county defendant in terms of training. As it relates to the district court's or the county, the plaintiff has not, the appellant did not produce an expert in this case to talk about the policies and procedures. They have no evidence that the policies and procedures of Greene County were unlawful. They have no evidence that Lieutenant Jones was improperly trained. To the contrary, the evidence in the record reveals he was properly trained and he met every requirement by the state of Tennessee as it relates to annual training. The claims against Greene County are very much unsupported by the evidence in this case. The state law claims essentially are redundant as it relates to the law. They're basically intentional port type of claims from the state of Tennessee and the law in the state of Tennessee looks at those claims, false arrest, I'm sorry, false imprisonment, assault, under the same that they do, that the federal laws require. And therefore, we would submit that if the claims are dismissed, there shouldn't be a command order issued on the state law claims. There should be a blanket dismissal in agreeing, which there is through Judge Corker's opinion. We submit that this court should sustain that in its entirety. I'm glad to answer any questions the court may have for me. I will say that there are ample cases in this court and others about bringing a knife to an encounter with a law enforcement officer, that that's considered to be a situation where deadly force is allowed. I would even argue in this particular situation, while I'm certainly glad it's only hypothetical, that deadly force could have been used in this way unlawfully. Again, we don't get there. Thank goodness. I'm glad I've got time left. I'm glad to go into any additional factors that the court may want to ask me about or answer any questions the court may have. I have no questions. None either. Thank you, Mr. Lauderback. Mr. Baker, you've got three minutes of rebuttal and maybe you want to start with the clearly established law that we look to the precedent that would hold that it's unreasonable for an officer to tase someone who is advancing toward them with what is maybe we call a non-traditional weapon. There seems to be case law for our circuit that would indicate that lethal force could be used in that sort of way. The second prong of qualified immunity has been met. Thank you, Judge. One case that I would like to cite too, and I don't know if I gave it before in my opening, but it's McCaig v. Raber. It is a Sixth Circuit decision from 2013, 515F, Federal Appendix 551. In that opinion, the court stated that it is clearly established that the use of force on a non-resistant or passively-resistant individual like Ms. Irwin, I would submit in this case, may constitute excessive force. Another case that this court took up that's very similar, and of course, your honors, I don't have an exact case on point. This was a very unique set of circumstances, and as this court knows, I don't think that I'm required to submit a case that is exactly on point. But another case that I would like the court's attention to, it was Judy Hodge v. Blount County et al. And that Sixth Circuit docket number was number 18-5391. Similar situation, you had an elderly man that was driving his truck. He was pulled over by a deputy that was in an unmarked car, in plain clothes at that point in time, had a sheriff's office, a small emblem. He approached the car. Mr. Hodge was very confused. He, in fact, had advanced vascular dementia. Mr. Hodge was even armed at this point in time with a handgun in the car that he was carrying legally. At this point in time, the officer didn't know that. But this court, with Mr. Hodge's hands on the steering wheel, 10 and 2, he was just sitting there. They ruled that that was passive resistance and that it was clearly a decision that the jury should decide and not something that the court should decide. One thing that Mr. Lauterbach had cited to, for the appellee in this case, was on page 19 of his brief. And Mr. Lauterbach states that the deployment of the taser on Ms. Irwin was routine on an individual firmly on her feet. Just like the court asked me a little bit ago about the hypothetical with a knife as opposed to a rake, does that change the standards? Does that use this case? If you take what Mr. Lauterbach said there, tase Ms. Irwin was routine on an individual firmly on her feet. Well, is it his position that a seven-year-old girl would have gotten the same treatment if she were walking towards an officer saying she's not going to stop with a rake in hand at that point? I mean, surely our policing standards are better than that. A seven-year-old girl had the same capacity, same strength that surely Ms. Irwin had at this point with her diminished capacity and all of her medical issues, which were known. I think that's very important for this court to know, which were known. Mr. Lauterbach submits that a deadly force could have been used. I think that's laughable at this point in time. Well, did the record reflect that Ms. Irwin has these emotional mental concerns and she's apparently somewhat slight, but is there anything in the record that would indicate that she cannot wield a rake like this in a way that would be harmful or deadly? I mean, she's 10 feet or so away. She's got this rake in an offensive position. You would have us find that Lieutenant Jones would somehow have to wrest the rake from her control. It's pretty dark out there from what I can see. I mean, is there anything in the record that suggests that she could not swing this rake in a way that would be harmful to Lieutenant Jones and what was then a very small amount of distance between the two of them? Your Honor, I don't think that I can point to anywhere specifically in the record that says that she could not wield the rake, other than her son saying on direct testimony, what would you have done? Well, I would have just taken the rake from her. Okay. She had a broom prior to this, arguably the same width, same length as a rake. I would submit that if he could take it from her, surely our trained police officers would. And lastly, I would like to just mention either the Graham factors apply or they don't. Right? I mean, the district court just did not even consider the first issue that we would submit goes in favor of Ms. Irwin. The third one, as far as passive and active resistance, we would submit goes in favor of Ms. Irwin. The second one we can sit here and debate, but in our view, she was not a threat, certainly not a deadly threat or serious bodily injury threat to Lieutenant Jones at this point in time. Okay. Well, your time has expired. We certainly appreciate your argument. Thank you, Mr. Baker, Mr. Lauterbach for your arguments this morning. The case will be submitted. I think that completes our argument calendar today. So the clerk may adjourn court. This honorable court is now adjourned.